WHEELER (COLLINS v.). See Case No. 3,-018.

WHEELER (COMSTOCK v.). See Case No. 3,071.

## Case No. 17,494.

WHEELER et al. v. The EASTERN STATE.

[2 Curt. 141.] [1]

Circuit Court, D. Massachusetts. Oct., 1854.

COLLISION—STEAMERS MEETING—USAGE.

1. The rule which requires two steamers approaching each other, to port their helms, and so pass on the starboard hand, must be acted on when there is any probable chance of collision by keeping their courses; it is not enough for the party, who departs from the rule, to show that they would have gone clear, if each had kept its course; he must also show, the other party ought to have perceived there was no probable chance of collision by so doing.

[Cited in Haney v. The Louisiana, Case No. 6,020; New York & B. Transp. Co. v. Philadelphia & S. Steam Nav. Co., 22 How. (63 U. S.) 473; The Sunny Side, Case No. 13,620.]

2. Semble, a local usage cannot vary the rule.

[Cited in The Clement, Case No. 2,879.]

[Appeal from the district court of the United States for the district of Massachusetts.

[This was a libel in admiralty by James P. Wheeler and others, owners of the Admiral, against the steamer Eastern State, to recover damages for a collision. From a decree of the district court (case unreported), libellants appeal.]

Hutchins & Wheeler, for appellants.
C. P. Curtis, Jr., contra.

CURTIS, Circuit Justice. This is a cause of collision brought here by an appeal by the

[1] [Reported by Hon. B. R. Curtis, Circuit Justice.]

libellants from a decree of the district court. The case made by the libel is, that, about six o'clock, in the evening of the 6th day of October, 1852, the steamer Admiral, bound from Eastport in the state of Maine, to Boston, was coming up the harbor of the latter place, and having arrived about opposite the upper end of a shoal called the "Lower Middle," was crossing towards the westerly side of the channel which is between that shoal and Castle island, when the captain and pilots of the Admiral first saw the steamer Eastern State, about half a mile above, coming out from among some sailing vessels, on the easterly side of the channel, bound out, headed for the Lower Middle, and, at the moment, three points on the starboard bow of the Admiral, so that if both vessels kept their course they would go clear. That the Admiral kept her course; the Eastern State changed hers to the westward, as soon as she was clear of the sailing vessels, and the result was, that she struck the Admiral forward of her wheel-house, and inflicted severe injury. The fault attributed to the Eastern State is, that when she got clear of the sailing vessels, she put her helm to port, instead of keeping her course and passing the Admiral on the starboard hand. The answer alleges, that the Eastern State, in coming down the channel, passed a sloop under sail, and, in order to do so, went on the easterly side of the channel, and as soon as the steamer was clear of the sloop, her helm was put to port, and her course changed for the starboard, or westerly side of the channel; and after this change of course the master of the Eastern State, who was on the look-out, forward, on the topgallant-forecastle, first saw the Admiral, about abreast of the lower buoy on the Lower Middle, and heading westerly; he supposed the Admiral would keep the east side of the channel; but instead of doing so the Admiral crossed the channel to the westward. The fault attributed to the Admiral is, that on arriving at the upper end of the Lower Middle shoal, instead of bearing to the northward and keeping on the eastern side of the channel, she kept her course, crossed the channel, got on the wrong side of it, and thus caused the collision. Before adverting to the controverted facts in this case, there are several things of much importance to be noticed. The first is, the rule of navigation applicable to the case of two steamers approaching each other. That rule is, that if two steamers are approaching each other, in such a manner that there is any probable chance of collision if they keep their courses, each is bound, seasonably to put the helm to port, so as to pass each other on the larboard hand. Some attempt has been made to show that at the time in question, this rule was not in force in navigating Boston Harbor. The rule having been declared by the highest authority, both in this country, and in England, in reference to vessels going free (4 Notes Cas. 42; 1 W. Rob.

Adm. 478; 2 W. Rob. Adm. 1, 277; 7 Notes Cas. 137; [St. John v. Paine] 10 How. [51 U. S.] 557; Lowry v. The Portland [Case No. 8,583]), and being equally applicable to steamers, I should more than doubt whether any local custom could be allowed to vary it. But I do not find in the case, evidence to prove such anomalous practice in this harbor. There are some rather loose and vague statements, made by two witnesses, who have been accustomed to navigate Boston Harbor in steamboats; but they amount to no more than this,—that though they are aware of the rule they disregard it. As to this, I have only to say, and wish it to be distinctly understood, that they and all others who disregard it, under circumstances to which it is applicable, do so at their own peril.

There is another consideration having an important bearing on the case. The place where this collision occurred, is the channel through which nearly all the shipping bound to and from the harbor of Boston passes. At and near that place this channel is of its least breadth. The shoal called the "Lower Middle," lying nearly east of Castle island, and ranging east and west, a steamer coming from sea and heading westward while abreast of the shoal, must change her course to the northward, when the shoal is passed, to head up to the city. If her course is changed while passing the end of the shoal, she keeps on the easterly, or right hand side of the channel; if she holds her westerly course after passing the end of the shoal, she crosses the channel, towards Castle island, and then changes her course to the northward, and is on the left and wrong side of the channel. Under some circumstances, and in some places, it might not be a matter of much importance, which was done. Not so in this case. The channel is narrow. It is greatly frequented. The dusk of the evening had come. And it is the concurrent testimony of all the disinterested witnesses who have skill, and have spoken to this point, that the invariable practice is, for steamers, coming up the harbor, when they arrive at that point, to bear to the northward round the westerly end of the Lower Middle, and thus keep on the easterly and right hand side of the channel. In crossing the channel therefore, the Admiral was in fault, and considering the hour and the place, the fault was a grave one.

The libellants insist that the Eastern State was also in fault; and that even if the Admiral did wrong in crossing the channel, the Eastern State might have avoided the collision by keeping on the east side, and passing the Admiral on the starboard hand; and under the circumstances was bound to do so. It is not enough for the libellants to show, that the steamers would have cleared each other if each had kept its course. They must go further, and show that there was no probable chance of a collision, if each kept her

course; and that this was, or ought to have been, apparent to the Eastern State. The rule does not permit, much less require, either to speculate upon chances of escape, or to depart from its requirement, which is to go to the right in all cases which admit of any question. It is not a rule to go to the right, if it seems best at the time to do so; but a rule to go to the right in all cases, where it is not clearly apparent there will be no collision, by keeping their respective courses. A moment's consideration will show, that the rule would lose nearly all its value, if those in charge of one steamer, were obliged, not only to determine whether they judged it best to go to the right, but also to speculate upon the probability that those in charge of the other steamer would decide in the same way. The purpose of the rule is to prevent collisions; not to have a law to settle collision cases when they occur. And, to prevent them, it is indispensable that both should act on one rule, and thus coöperate. This cannot be attained, if the course, when questionable, is left to the judgment and presence of mind of those in charge. Their judgment and presence of mind will not be the same, and in practice they will not coöperate, and thus collisions will occur. Now, upon the proofs, I do not think it is made out that the Eastern State ought to have perceived, there was no probable chance of a collision if she departed from the rule and kept her course. It is testified by those on board the Admiral, that when they were about abreast of the upper end of the Lower Middle, they first saw the Eastern State, and she was then about half a mile off and three points on the starboard bow. Take this to be true, and suppose also that the Eastern State was then coming out from among the vessels, and was then in the act of changing her course; facts which are controverted by the claimants, who assert that when her course was changed, the Admiral was abreast of the lower part of the shoal; but take the facts to be as asserted by those on board the Admiral; was it apparent to the Eastern State, that there was no probable chance of a collision if she kept her course? Suppose she had done so, and the Admiral had borne to the northward in passing the end of the shoal, and so kept on the eastern side of the channel, a collision would have been almost certain. In that case, in my judgment, the Eastern State would have been in the wrong. Because, in considering whether there was a probable chance of collision by keeping her course, those in charge of her were bound to know that the channel was crooked there, that it inclined to the northward rapidly, after passing the shoal, that the usual course of steamers coming in was, to haul to the northward in passing beyond the shoal, and thus keep on the easterly side, and therefore the Admiral might be expected to do so, and if this were done, there would be not only a probable chance, but almost a certainty of a collision. And, if upon these grounds, the Eastern State would have done wrong, to depart from the rule, it necessarily follows that she did right to adhere to it, and the disaster is attributable, not to the observance of the rule by the Eastern State, but to a departure by the Admiral from the usual and proper course at that point, crossing the channel, instead of keeping on its eastern side.

It was argued that the course of the Eastern State was changed, after it was apparent the Admiral was crossing the channel; and when it ought to have been perceived, that if she kept her course they would clear each other, but if she attempted to go to the right, they must come together. Of this I am not satisfied. I think the evidence quite strongly preponderates the other way. I have read the whole of the evidence and considered the arguments of the counsel, and my opinion is, that the helm of the Eastern State was put to port as soon as possible after passing the vessel under sail, and while those in charge of her believed, and had a right to believe, the Admiral would take the usual course, and keep up the channel, and not cross it. Let the decree of the district court be affirmed with costs.